**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOSE MENDOZA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO, *et al.*,<br><br>Defendants. | Case No. 22 C 827<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jose Mendoza brings this civil rights action under 42 U.S.C. § 1983 against the City of Chicago and Officers Iwan Smith, P.G. Grube, M.L. Leon, J.M. Sesso, H. Mahic, T.M. Kociolek, and K.A. Stoppa; Commander Eric Winstrom; and Sergeant Ronald Malczynski of the Chicago Police Department. (Dkt. 40). Defendants move for summary judgment.[1] (Dkt. 153). For the reasons discussed below, Defendants' motion for summary judgment is granted.

**BACKGROUND**

The relevant facts are taken from the parties' respective Local Rule 56.1 statements and the evidence in the record.[2] *See* Fed. R. Civ. P. 56(c)(3) (providing that courts may consider all materials in the record, cited and non-cited). Before turning to the facts, however, the Court notes that the majority of the record citations in Plaintiff's statement of additional facts are inaccurate. Plaintiff states that the exhibits on which he relies have been attached to his response to Defendants' motion for summary judgment "as Plaintiff's Exhibits '1'-'43' *See Dckt.* #188." (Pl.'s

[1] Plaintiff previously dismissed his claims against Officer Stoppa. (Dkt. 146).

[2] The Court refers to Plaintiff's response to Defendants' Local Rule 56.1(a)(2) Statement of Undisputed Material Facts as "Dkt. 176" and Defendants' Joint Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Material Facts as "Dkt. 206."

Stmt. of Add'l Facts (PSOAF) at 3045, Dkt. 189).[3] Plaintiff only attached 22 exhibits to his response brief, however.

As a result, Plaintiff cites exhibits that seemingly are not in the record and cites the wrong exhibits. For example, the citation supporting Plaintiff's first factual statement is "*See Exhibit '7' Mendoza Deposition, p. 44-46, 56; Exhibit 36.*" (*Id.* ¶ 1). Exhibit 7 to Plaintiff's response brief is Defendant Officer Smith's Deposition, (Resp., Ex. 7 (Smith Dep.), Dkt. 188-7), and Plaintiff did not file an Exhibit 36. Plaintiff's deposition is Exhibit 1 to his response brief. (Resp., Ex. 1 (Pl. Dep.), Dkt. 188-1). Defendants noted these errors in their response to Plaintiff's statement of additional facts (Dkt. 206), but Plaintiff made no attempt to correct them.

Plaintiff's objections to Defendant's statement of facts have the same citation errors. (*See, e.g.*, Dkt. 176 ¶ 31) (referencing Ariana Colon Jacobo's deposition but citing Sergeant Ronald Malczynski's). Plaintiff's response to Defendants' motion for summary judgment does as well. (*See e.g.*, Resp. at 1468, Dkt. 188) (referencing surveillance video but citing deposition). In light of Plaintiff's citation errors, the Court will consider only those disputed material facts asserted by Plaintiff for which the intended supporting evidence is clear. Where this is not clear, the fact will not be considered. *See* N.D. Ill. Local Rule 56.1(d)(2), (e)(3).

Additionally, the Court observes that Plaintiff's response brief cites the raw record materials directly instead of the parties' Rule 56.1 statements or responses, which violates Local Rule 56.1(g) and defeats the purpose of Rule 56.1 in general.[4] *See Dominguez v. Park City*, No. 19 C 5327, 2023 WL 2664393, at *5 (N.D. Ill. Mar. 28, 2023) ("Defendants repeatedly violate Local

[3] Unless otherwise noted, page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document.

[4] Local Rule 56.1(g) provides that "[w]hen addressing facts," a memorandum of law supporting or opposing summary judgment "must cite directly to specific paragraphs in the LR 56.1 statements or responses."

Rule 56.1 throughout their memoranda of law by citing directly to the record rather than their Local Rule 56.1 Statement of Facts. Such a practice is highly improper."); *Wisconsin Cent., Ltd. v. TiEnergy, LLC*, No. 15 C 2489, 2017 WL 1427065 (N.D. Ill. Apr. 21, 2017) ("Wisconsin Central cites directly to evidence in the record instead of citing Rule 56.1 statements, which defeats the purpose of Rule 56.1."), *aff'd,* 894 F.3d 851 (7th Cir. 2018). Consequently, the Court will not consider any facts included in Plaintiff's response brief that are not included in his Rule 56.1 statement. *See Perez v. Town of Cicero*, No. 06 C 4981, 2011 WL 4626034, at *2 (N.D. Ill. 2011) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion.").

## I. Facts

The following facts are undisputed unless otherwise noted.

### A. The Shooting

On March 30, 2021, at around 9:45 to 10:00 p.m., Plaintiff's friend dropped him off at a bar in Albany Park, Chicago. (Dkt. 176 ¶¶ 11, 15). Plaintiff recalls drinking at the bar alone, but does not remember how many drinks he had, what kind of drinks he had, how much money he spent at the bar, whether he went to any other bars, or what time he left the bar. (*Id.* ¶ 17). Plaintiff became severely intoxicated, and as a result, he has no independent recollection of what happened after he arrived at the bar. (*Id.* ¶ 23). Plaintiff does recall that he planned to spend the night at a friend's home near the bar. (*Id.* ¶ 18).

At around 12:40 a.m., however, Plaintiff entered the lobby of an apartment building located at 3151 West Belle Plaine Avenue through an unlocked door. (Dkt. 206 ¶¶ 1-3). Plaintiff's friend's home was .3 miles away. (*Id.* ¶ 1). 3151 West Belle Plaine Avenue is where Defendant Officer Iwan Smith lived in a first-floor apartment with his wife, Ariana Colon Jacobo and their infant

daughter. (*Id.* ¶¶ 6-7). That night, Smith and his family were watching a movie in their living room. (Dkt. 176 ¶ 26). Smith has been a police officer for the Chicago Police Department ("CPD") for more than 7 years. (*Id.* ¶ 24). Plaintiff did not know Smith or his wife. (*Id.* ¶¶ 21, 56).

A surveillance camera in the apartment building's lobby captured what transpired next. The video (which does not have audio) begins with Plaintiff moving about the lobby aimlessly for 9 minutes. (Dkt. 206 ¶ 6). Plaintiff appears unsteady on his feet, at one point seemingly struggles to put his hand in the front pocket of his hoodie, and he alternates between leaning on the wall of the lobby, sitting on a set of stairs, and sitting on the floor. (*Id.*; Dkt. 179, Ex. 1). Plaintiff then walks up the set of five stairs to the first-floor landing and onto a welcome mat in front of Smith's apartment. (Dkt. 206 ¶¶ 6-7; Dkt. 179, Ex. 1). Only part of the welcome mat in front of Smith's door is visible, and Smith's actual door is not visible because it is recessed behind a wall. (*See* Defs.' Stmt. of Facts (DSOF), Ex. 8 (Video), Dkt. 161; *see* DSOF, Ex. 9 (Door Photos), Dkt. 158-9). Also, the video shows only the bottom half of the first-floor landing, so when Plaintiff stands there, the upper half of his body is not visible. (*See* Video).

According to the video, Plaintiff starts standing on Smith's welcome mat at around 12:51 a.m. (*Id.* at 1:22:36). A still image from the video at this time is produced below; Plaintiff is partially visible in the top right corner:




(*Id.*) The parties agree that the timestamp on the security video is 31 minutes ahead of the actual time. (Dkt. 206 ¶ 3). Plaintiff stands on Smith's welcome mat, facing Smith's door, for about 30 seconds. (Video at 1:22:36-1:23:04). For the majority of that time, view of the front of Plaintiff's body is blocked by the wall that blocks the view of Smith's door. (*See id.*)

At 12:52 a.m., Plaintiff takes a step back, taking one foot off the mat, and stands sideways in Smith's doorway for about 10 seconds before turning away from the door and squatting with both feet on the mat and his back to the door. (*Id.* at 1:23:04-1:23:14). Plaintiff squats for 7 seconds, and then a light comes from the doorway. (*Id.* at 1:23:22). Plaintiff stands up, turns around, steps further in the doorway, and then is obscured by the wall. (*Id.* at 1:23:22-1:23-25). After about 2 seconds, Plaintiff comes back in view, bending down onto Smith's welcome mat with his face nearly touching the floor. (*Id.* at 1:23:25-1:23:27). A pool of blood forms under his head. (*Id.* at 1:23:25-1:23:46).

Smith had opened the door to his apartment and shot Plaintiff in the face. (Dkt. 176 ¶ 10). Plaintiff was at Smith's door for about a minute before being shot. (*See* Video 1:22:36-1:23:27). The parties dispute what happened during that minute, and it is not clear from the video because

of the lack of audio and the wall blocking the view of Smith's door. The parties agree, however, that Plaintiff was unarmed, possessed no burglary tools, and caused no damage to Smith's apartment door or to the 3151 W. Belle Plaine Avenue building. (Dkt. 206 ¶ 4). The parties also agree, though, that Smith could not view Plaintiff prior to opening his door because the door had no peephole, window, or anything that would allow Smith to see into the hallway. (Dkt. 176 ¶ 37).

Smith's version of events is as follows. While Smith, his wife, and infant daughter were watching a movie in their living room, they heard a commotion outside of their unit. (*Id.* ¶ 26). They were not expecting any visitors. (*Id.* ¶ 27). The noise continued to get closer to their door. (*Id.* ¶ 28). They heard someone begin thrusting against their apartment door, hitting the doorknob and turning it for an extended period. (*Id.* ¶ 29). Smith asked more than three times through the door, "who is it?" and then said, "get away from the door," but got no response. (*Id.* ¶ 31). The noise continued at the door, and it sounded as if the person was getting a bit more aggressive. (*Id.* ¶ 32). Smith and Colon were concerned that someone was going to break in. (*Id.* ¶ 33).

Smith retrieved his service weapon and approached the door. (*Id.* ¶ 36). Because his front door had no peephole or window, he had to crack the door open to see who was outside. (*Id.* ¶¶ 37-38). Before he opened the door, Smith could feel someone against the door and could hear them outside the door. (*Id.* ¶ 40). Smith cracked open the door and saw Plaintiff crouched down, but then Plaintiff quickly turned around and pushed the door open. (*Id.* ¶ 41). A struggle at the door ensued, during which time Smith told Plaintiff some combination of "Get back," "stand back," "I have a gun," "police," and "stop." (*Id.* ¶ 42). Plaintiff continued to push inside the apartment; Smith had only his left hand on the door, while his right hand was holding his gun. (*Id.* ¶ 43). Smith thought that Plaintiff was going to reach up and try and grab Smith's gun after he noticed Plaintiff look at the gun. (*Id.* ¶ 44). Smith feared for his life because Plaintiff used his

hands and feet as leverage to push open Smith's door. (*Id.* ¶ 49). Smith then fired one shot from his gun, which struck Plaintiff in the head. (*Id.* ¶ 46). The struggle at the door lasted about 3 seconds. (*Id.* ¶ 53).

At his deposition, Smith testified that he was acting as a CPD officer during his interaction with Plaintiff. (Smith Dep. at 2073). He said he felt like he was investigating a home invasion and was trying to keep the peace by preventing a crime. (*Id.* at 2073-2074). Smith testified that he believed that he effectively placed Plaintiff under arrest after he identified himself as police and shot Plaintiff, but he did not say verbatim, "You're under arrest." (*Id.* at 2075).

Plaintiff does not dispute that Smith placed him under arrest just after shooting him, (Dkt. 206 ¶ 22), but he disputes much of the rest of Smith's version of events, relying on other evidence in the record or the lack thereof since he has no independent recollection of that night. First, Plaintiff disputes Smith's and Colon's testimony about hearing noises, arguing that nothing in the video indicates that he made noise outside of Smith's apartment. (Dkt. 176 ¶ 28). Similarly, Plaintiff disputes Smith's and Colon's assertion that he hit their door and turned their doorknob because, according to Plaintiff, "[t]he video does not show what Plaintiff was doing at the door." (*Id.* ¶ 29). Plaintiff disputes that Smith asked, "who is it?", because Colon stated that Smith did not say anything prior to opening the door. (*Id.* ¶ 31). Plaintiff also disputes Smith's testimony that he could feel someone sitting against the door, arguing that "[t]he video does not show [him] sitting against the door, but rather on the welcome mat[ with] his back to the wall of the landing." (*Id.* ¶ 40). Additionally, Plaintiff contends that he did not push Smith's door open, and he disputes Smith's testimony that he "cracked the door open." (*Id.* ¶ 41). According to Plaintiff, "[b]ased on the amount of light that was cast on the floor, it appears [Smith] opened [the door] far more than 'a crack.'" (*Id.* ¶ 42).

Plaintiff strongly disputes Smith's testimony that a struggle ensued once Smith opened the door. (*Id.*) Plaintiff asserts that there was no time for a struggle to happen because the video shows that Smith shot Plaintiff within 2 seconds of opening the door. (*Id.* ¶¶ 42, 44). Plaintiff also disputes Smith's claim that he entered Smith's apartment. (*Id.* ¶ 43). Plaintiff argues that "[t]he video clearly shows that Plaintiff's foot did not leave [Smith's] welcome mat." (*Id.*) Finally, Plaintiff notes that Smith had consumed two alcoholic beverages that night, which is undisputed. (Dkt. 206 ¶ 23).

**B. <u>Emergency Response</u>**

After shooting Plaintiff, Smith told Colon to call the police, which she did. (Dkt. 176 ¶ 55). Several first responders came to the scene at Smith's apartment, (*see* DSOF, Ex. 19 (Case Sup. Report), Dkt. 158-19), including Defendants Officer T. Kociolek, Officer H. Mahic, Officer P. Grube, Officer M. Leon, Sergeant Ronald Malczynski, and Commander Eric Winstrom, (*id.* at 1126-1127; Dkt. 176 ¶ 59). At that time, Winstrom was the Commander of CPD's Area 5 detectives. (Dkt. 176 ¶ 58). Malczynski was a CPD sergeant. (*Id.* ¶ 61). Grube and Leon were both CPD patrol officers assigned to the tactical team, and they were partners. (*Id.* ¶¶ 65, 71, 74). Mahic and Kociolek were also CPD patrol officers and partners. (*Id.* ¶¶ 81, 85). Malczynski, Grube, Leon, Mahic, and Kociolek did not know Smith prior to this incident. (*Id.* ¶¶ 64, 69, 76, 84, 88). It is unclear whether Winstrom did. Malczynski, Grube, Leon, Mahic, and Kociolek learned that Smith was a CPD officer when they arrived at the scene because Smith showed them his police star. (Resp., Ex. 16 (Kociolek Dep.) at 2634, Dkt. 188-16; Resp., Ex. 11 (Malczynski Dep.) at 2488-2489, Dkt. 188-11; Resp., Ex. 10 (Leon Dep.) at 2393, Dkt. 188-10; Resp., Ex. 17 (Mahic Dep.) at 2739, Dkt. 188-17; DSOF, Ex. 14 (Grube Dep.) at 1064-1065, Dkt. 158-14). None of the Defendants on scene knew Plaintiff prior to this incident. (*Id.* ¶ 89).

Smith did not provide Plaintiff with any aid, so Plaintiff remained on the first-floor landing, writhing around and bleeding, for about 10 minutes until the Chicago Fire Department arrived and took him to a hospital. (Dkt. 206 ¶ 20; Case Sup. Report at 1131; Dkt. 179, Ex. 39). Officers Mahic and Kociolek went to the hospital with Plaintiff and stood outside his hospital room. (Dkt. 206 ¶ 32). Before leaving with Plaintiff, "Kociolek spoke with Smith at the scene and asked simple questions." (Dkt. 176 ¶ 87). "Smith said something about someone trying to push into [his] apartment." (*Id.*)

Sergeant Malczynski talked to Smith when he arrived at the scene. (*Id.* ¶ 63). He asked Smith which police district he was from, where his weapon was, and whether he had been shot. (*Id.*)

Officer Grube had a conversation with Smith on scene where he told Smith, "We got you, brother" multiple times. (*Id.* ¶ 67). He also told Smith, "Hang tight, hang tight, hang tight before you talk to anybody," after Smith said, "He pushed in my door." (Dkt. 206 ¶ 25; Dkt. 179, Ex. 20(b)).

Officer Leon talked with Smith as well. (Dkt. 176 ¶ 73; Dkt. 179, Ex. 20(b)). At some point during the conversation, Smith said something to the effect of, "He tried to knock down my door." (Dkt. 176 ¶ 73; Leon Dep. at 2393-2394).

Smith was transported by ambulance to a hospital to be treated for chest pain. (Dkt. 176 ¶ 57). Before Smith was taken to the hospital, Winstrom asked Smith if he had any gunshot wounds, and Smith said no. (Resp., Ex. 8 (Winstrom Dep.) at 2122, Dkt. 188-8).

Officers Kociolek and Mahic prepared an arrest report naming Plaintiff as the offender of a home invasion, residential burglary, and criminal trespass to residence. (Dkt. 206 ¶ 35). Defendant Officer J.M. Sesso, a lieutenant, reviewed the arrest report and approved the home

invasion and residential burglary charges for probable cause at 7:52 a.m. on March 31, 2021, about 7 hours after the shooting. (*Id.* ¶ 38).

### C. Investigation

Detectives from CPD's Investigative Response Team ("IRT") handle criminal investigations connected to officer-involved shootings. (Dkt. 176 ¶ 91; Winstrom Dep. at 1034). As such, IRT detectives investigated Plaintiff's case. (*Id.*) IRT detectives went to the scene at Smith's apartment, took statements from Smith, Colon, and Officers Grube, Leon, Mahic, and Kociolek; and they reviewed the footage from the responding officers' body-worn cameras. (*Id.* ¶¶ 91, 93; DSOF, Ex. 11, Case Rep. at 1012-1030, Dkt. 158-11). A case report prepared by the lead IRT detective, Wade Golab, indicates that he was unable to interview Plaintiff due to his condition. (Case Rep. at 1030).

Some hours after the shooting, Detective Golab contacted the Cook County State's Attorney Office's ("CCSAO") Felony Review Unit and relayed the facts of his investigation to Assistant State's Attorney ("ASA") Bonnie Greenstein, a trial supervisor within the Felony Review Unit. (DSOF, Ex. 20 (Greenstein Dep.) at 1145, Dkt. 158-20; Dkt. 176 ¶ 109). According to Greenstein, ASAs in the Felony Review Unit review and make charging decisions in cases where law enforcement have requested felony charges. (Dkt. 176 ¶ 108). Greenstein interviewed Smith and Colon the morning of the shooting, and she watched the responding officers' body-worn camera footage. (*Id.* at 110; Greenstein Dep. at 1147). Greenstein did not approve charges in Plaintiff's case at that time. (Dkt. 176 ¶ 114). She instead designated the case for a "continuing investigation." (*Id.* ¶ 115).

Detective Golab contacted the Felony Review Unit again the day after the shooting, on April 1, 2021, once CPD had recovered the surveillance video from the lobby of Smith's apartment

building. (*Id.* ¶ 120; Case Rep. at 1030). This time, Golab spoke to ASA Katherine Fox, another trial supervisor within the Felony Review Unit. (Dkt. 176 ¶ 117; Case Rep. at 1030). Fox reviewed the surveillance video, and she testified that she also would have reviewed summaries of Smith's and Colon's interviews with Greenstein, the body-worn camera footage of the responding officers, and any available photographs. (Dkt. 176 ¶ 119). After reviewing the additional materials, Fox approved felony charges against Plaintiff. (*Id.* ¶ 118).

**D. <u>Criminal Prosecution</u>**

On April 2, 2021, the CCSAO filed a criminal case in the Circuit Court of Cook County against Plaintiff. (*Id.* ¶ 124; DSOF, Ex. 23 (Disposition Stmt.) at 1166, Dkt. 153-23). Plaintiff had a bond hearing that day, and a Circuit Court judge found probable cause to detain him. (*Id.*)

On April 21, 2021, ASA Ellen Carroll presented Plaintiff's case before a Cook County grand jury. (Dkt. 159 ¶ 125). As a result of the grand jury proceeding, the CCSAO charged Plaintiff with three felonies: home invasion, residential burglary, and criminal trespass to residence. (*Id.* ¶ 126; Dkt. 176 ¶ 126).

At a hearing in Plaintiff's criminal case on February 13, 2023, the CCSAO elected to *nolle prosequi* Plaintiff's home invasion and residential burglary charges. (Dkt. 176 ¶ 138). The ASA did not explain the CCSAO's reasoning at the hearing. (*See* DSOF, Ex. 28 (Feb. 17, 2023 Tr.), Dkt. 158-28).

Plaintiff's case was set for a bench trial on August 28, 2023, but, on that day, Smith did not appear in court. (Dkt. 176 ¶¶ 141-143; DSOF, Ex. 29 (Aug. 28, 2023 Tr.) at 1211, Dkt. 158-29). The ASA told the judge that the State's attempts to personally serve Smith with a trial subpoena were unsuccessful and then moved for a continuance of Plaintiff's trial "to obtain personal service." (Aug. 28, 2023 Tr. at 1211). The judge denied the motion, finding that Smith was

personally served because he was given the CCSAO's phone number but "took no action." (*Id.* at 1215). Following the judge's ruling, the ASA moved to *nolle prosequi* Plaintiff's remaining charge, criminal trespass to residence, because it could not proceed without Smith's testimony. (*Id.*) The judge granted the motion and discharged Plaintiff. (*Id.* at 1216).

## II. <u>Procedural History</u>

Plaintiff's first amended complaint ("FAC") consists of five claims: excessive force against Officer Smith (Count 1); indemnification against the City of Chicago (Count 2); state-law battery against Officer Smith (Count 3); federal malicious prosecution against all Defendants (Count 4); and state-law malicious prosecution against all Defendants (Count 5). (FAC ¶¶ 42-74, Dkt. 40). Plaintiff further alleges that the City of Chicago is liable for Counts 4 and 5 pursuant to *Monell Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and *respondeat superior*. (FAC ¶¶ 68, 74). *Monell* discovery is stayed pending resolution of individual officer liability. (Dkt. 134).

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence," *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what

evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (internal quotation marks omitted) (quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020)). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, all "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255. Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Finally, "[s]peculation cannot create a genuine issue of fact that defeats summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims. (Dkt. 153). Defendants Smith, Winstrom, Malczynski, Grube, Leon, Sesso, Mahic, and Kociolek (the "Individual Defendants") assert qualified immunity as a defense against Plaintiff's constitutional claims and argue that all of Plaintiff's claims fail on the merits. (Mem. at 818, 838-848, Dkt. 157). The City of Chicago argues that Plaintiff's claims against it fail because they depend on an underlying constitutional or state-law violation, which Plaintiff has not established. (*Id.* at 847-848).

### I. Constitutional Claims

The Court will first consider whether the Individual Defendants are entitled to qualified immunity from Plaintiff's constitutional claims. "Qualified immunity protects public servants from

liability for reasonable mistakes made while performing their public duties."[5] *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (citing *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)). To defeat the defense of qualified immunity, a plaintiff must show two elements: first, that the facts viewed in the light most favorable to him show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the violation. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019); *Holleman v. Zatecky*, 951 F.3d 873, 877 (7th Cir. 2020). For the second element, the plaintiff must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser*, 933 F.3d at 701 (internal quotation marks omitted) (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017)). "[L]ower courts have discretion to decide which of the two prongs of [the] qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### A. Count 1: Excessive Force

In Count 1, Plaintiff alleges that Defendant Smith used "excessive force in his efforts to investigate, seize, and process Plaintiff throughout his arrest," in violation of his Fourth Amendment rights.[6] (FAC ¶ 44). Because Smith asserts that he is entitled to qualified immunity, the Court will first consider whether Plaintiff has shown that Smith violated a clearly established right.

---

[5] The parties agree that Smith was acting in his capacity as a CPD officer when he shot Plaintiff. (Reply at 3190, Dkt. 25).

[6] In his amended complaint, Plaintiff also alleges that Smith used excessive force against him in violation of his Fourteenth Amendment rights, but Plaintiff does not repeat this claim in his response brief. (FAC ¶¶ 44-48). Accordingly, Plaintiff has waived any Fourteenth Amendment excessive force claim. *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-598 (7th Cir. 2003). Such a claim would not appropriate in this context anyway. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

### 1. <u>Clearly Established Right</u>

In an excessive force case, a plaintiff can show that the right at issue was clearly established "either by identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on him' or by showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Findlay*, 722 F.3d at 899 (quoting *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008)). Plaintiff advances several arguments in support of his position that Smith violated clearly established law; the Court will consider each in turn.

#### a. ***<u>Weinmann, Becker, and Garner</u>***

First, Plaintiff contends that "[i]t is beyond debate that a person has a right to be free of deadly force 'unless he puts another person (including a police officer) in imminent danger, or he is actively resisting arrest, and the circumstances warrant that degree of force.'" (Resp. at 1500) (quoting *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015)). Plaintiff further argues that "[t]he Fourth Amendment does not sanction an officer, without a word of warning, shooting an unarmed offender who is not fleeing, actively resisting or posing an immediate threat to the officer or public." (*Id.*) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). For these general principles, Plaintiff cites *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015); *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016); and *Tennessee v. Garner*, 471 U.S. 1 (1985). However, Plaintiff cannot cite case law in broad strokes to 'define clearly established law at a high level of generality.'" *McKay v. Patino*, No. 25 C 679, 2025 WL 3470601, at *5 (N.D. Ill. Dec. 3, 2025) (*quoting Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018)). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). As explained below, *Weinmann*, *Becker*, and *Garner*, do not establish that Officer Smith's conduct violated the Fourth Amendment.

In *Weinmann*, a woman called police because her husband went into their garage with a shotgun threatening to kill himself. 787 F.3d at 446. Within three minutes of arriving at the scene, the responding officer forced entry into the garage where the husband was sitting in a chair with the shotgun and then shot the husband four times. *Id.* at 446-447. The husband, who survived, and wife filed a Section 1983 action against the officer and the county, bringing excessive force and other claims. *Id.* On summary judgment, the district court found that a factual dispute about the husband's conduct immediately before the shooting precluded a ruling on qualified immunity, and the Seventh Circuit agreed. *Id.* at 449-451. The Seventh Circuit explained that if, as the husband and wife claimed, the husband was sitting in the garage with the shotgun on his lap when the officer came in and shot him, the officer's use of force was excessive. *Id.* at 451. But if the husband raised the gun and pointed it at the officer, as the officer claimed, the officer's "assessment of the situation [was] objectively reasonable." *Id.* at 450.

The excessive force claim in *Becker* arose from the execution of an arrest warrant. 821 F.2d at 923. The arrestee alleged that one of the arresting officers "used excessive force because, after [the arrestee] had surrendered, [the officer] pulled him down three steps and placed his knee on his back while allowing a police dog to continue to bite him." *Id.* The Seventh Circuit affirmed the denial of qualified immunity for the officer because a jury could reasonably find that the officer used excessive force, and "it was clearly established at the time of [the arrestee's] arrest that no more than minimal force was permissible to arrest a non-resisting, or passively resisting, suspect." *Id.* at 930.

In *Garner*, the U.S. Supreme Court considered the "constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon." 471 U.S. at 3. There, a police officer fatally shot a suspected burglar to stop him from escaping over a fence. *Id.* The

Supreme Court held that officer's use of deadly force was unjustified because the officer "did not have probable cause to believe that [the suspect], whom [the officer] correctly believed to be unarmed, posed any physical danger to himself or others." *Id.* at 21. The Supreme Court explained that "the fact that [the decedent] was a suspected burglar could not, without regard to the other circumstances, automatically justify the use of deadly force." *Id.*

*Weinmann*, *Becker*, and *Garner* concern three entirely different scenarios than the one at issue here. *Becker*, which is about a police dog biting an arrestee, is not at all analogous to the present case. And in *Weinmann* and *Garner*, the officers were dispatched to particular incidents and therefore had prior information about the circumstances they encountered. Officer Smith, in contrast, encountered Plaintiff unexpectedly at his own home after midnight while watching a movie with his family. Smith had no prior warning or explanation for Plaintiff's presence, did not know Plaintiff, and because he could not see through his apartment door to the outside hallway, could not assess Plaintiff without opening the door. In evaluating whether Plaintiff was a threat, Smith had far less information to go on than the officers in *Weinmann* and *Garner*.

To defeat qualified immunity, Plaintiff need not identify an identical case, but "[t]he case must be closely analogous 'in a particularized sense' stemming from specific analogous facts rather than 'in an abstract or general sense.'" *Crampton v. Little*, No. 4:24-CV-04156, 2026 WL 1081149, at *4 (C.D. Ill. Apr. 21, 2026) (quoting *Findlay*, 722 F.3d at 900). Moreover, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix*, 577 U.S. at 13). Accordingly, *Weinmann*, *Becker*, and *Garner* may be relevant generally, but they are

too factually dissimilar to put the constitutional question here "beyond debate." *Manery v. Lee*, 124 F.4th 1073, 1080 (7th Cir. 2025).

**b. The Laquan McDonald Shooting**

In arguing that Smith violated his clearly established Fourth Amendment rights, Plaintiff also points to the disturbing shooting of Laquan McDonald. Plaintiff argues that "[i]t would be difficult for the defendants to argue that they were not aware of prior cases wherein a Chicago police officer used deadly force against a suspect who did not pose an immediate threat." (Resp. at 1501). Plaintiff notes Defendant Winstrom's testimony that the City of Chicago created a new policy for officer-involved shootings after McDonald's fatal shooting. (*Id.*) (citing Winstrom Dep. at 2127, 2179, 2204-2205). Thus, Plaintiff contends the McDonald shooting shows that "[a] police officer does not have a right to shoot someone who does not pose an immediate threat" and "if force is used[,] it must be proportionate to the threat." (*Id.*)

Plaintiff's reliance on this shooting incident is misplaced. First, the facts surrounding McDonald's shooting are not closely analogous to this case. There, on October 20, 2014, at around 10:00 p.m., CPD officers responded to a call about an individual carrying a knife and breaking into cars and encountered 17-year-old McDonald walking down the middle of Pulaski Road with a knife in his hand. Josh Sandburn, *Chicago Releases Video of Laquan McDonald Shooting*, Time (Nov. 24, 2015, 7:33 PM CT), https://time.com/4126670/chicago-releases-video-of-laquan-mcdonald-shooting/. Within seconds of arriving at the scene, CPD Officer Jason Van Dyke exited his police cruiser and shot McDonald 16 times while McDonald was walking away from him. *Id.*; Chicago Sun-Times, *Laquan McDonald shooting video*, (Aug. 24, 2018), https://www.youtube.com/watch?v=xaXuT9sxCnI. McDonald's killing garnered extensive media attention, and Officer Van Dyke was subsequently charged and convicted of second-degree murder and aggravated battery. *See generally People v. Van Dyke*, 2020 IL App (1st) 191384.

Plaintiff acknowledges that "the facts of the McDonald case are not directly on point," but he argues that "the message is clear[:] A police officer does not have a right to shoot someone who does not pose an immediate threat." (Resp. at 1501). Again, however, Plaintiff "is operating at too high a level of generality with respect to the second prong of the qualified immunity analysis." *Lerma v. Bollow*, No. 3:22 C 50369, 2025 WL 744029, at *8 (N.D. Ill. Mar. 7, 2025). An officer certainly cannot shoot someone who does not pose an immediate threat. But "[t]he issue is whether the law, as it existed at the time of the incident, would have put [Smith] on notice that [Plaintiff's] behavior did not justify the use of lethal force." *Id.* The McDonald shooting does not bear on the legality of Smith's actions because it is unquestionably not closely analogous to the shooting here.[7] As such, Defendants are correct that Laquan McDonald's shooting is both "factually irrelevant to the case at hand" and "unenlightening as it pertains to qualified immunity." (Reply at 3197).

**c. *People v. Yanez***

Plaintiff's next argument is that *People v. Yanez*, 2022 IL App (3d) 200007 "undercut[s]" Defendants' argument "that there are no cases establishing that a police officer commits excessive force when using deadly force to prevent an unknown intruder from violently entering his apartment unit while his family is home." (Resp. at 1502). In *Yanez*, the defendant was charged with second-degree murder for stabbing his girlfriend's brother to death while the brother attempted to break into the defendant's home. 2022 IL App (3d) 200007 ¶¶ 20, 23. The defendant's conviction was vacated on appeal because the Illinois Appellate Court concluded that the defendant's use of deadly force in defense of his dwelling was justified. *Id.* ¶¶ 31, 40.

[7] Additionally, it is not apparent that any Fourth Amendment case law arising out of the shooting exists as McDonald's family and the City of Chicago settled out of court, before any civil lawsuit was filed. *$1 million per shot—how Laquan McDonald settlement unfolded after that initial demand*, Chicago Sun-Times (June 24, 2016, 8:52 a.m. CT), https://chicago.suntimes.com/2016/6/24/18465327/1-million-per-shot-how-laquan-mcdonald-settlement-unfolded-after-that-initial-demand

In reaching that conclusion, the appeals court noted that (1) the defendant was not the aggressor, (2) he was not required to call the police, (3) the girlfriend's brother reached into the defendant's home after breaking the window of the door to the home, (4) the girlfriend's brother said, "I'm going to fuck your ass up" while trying to enter the home, and (5) the defendant's 14-year-old nephew, who was in the home at the time, was scared. *Id.* ¶ 31. According to the appeals court, those facts alone established that the defendant reasonably believed that deadly force was necessary to prevent the girlfriend's brother from entering the home and assaulting him and his nephew. *Id.*

*People v. Yanez* does not aid Plaintiff either. Plaintiff contends that *Yanez* is distinguishable from this case because Smith is larger than Plaintiff, whereas the girlfriend's brother in *Yanez* was much larger than the defendant, and Plaintiff did not aggressively knock on Smith's door, say anything to Smith, or place Smith in imminent danger, in contrast to the girlfriend's brother in *Yanez.* (Resp. at 1503). But by attempting to distinguish *Yanez* from this case, Plaintiff inverts the clearly established law inquiry. The question is not whether Defendants can identify favorable authority, but whether *Plaintiff* can identify precedent placing the constitutional question beyond debate. *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655 (7th Cir. 2024); *see also Villalobos v. Picicco*, 168 F.4th 1057, 1064 (7th Cir. 2026) (explaining that distinguishing a case cited by the defendants "is not the point of the qualified immunity test"). *People v. Yanez* does not accomplish that; if anything, it "muddies the waters." *Villalobos*, 168 F.4th at 1065.

**d. <u>Plainly Excessive Force</u>**

Plaintiff also appears to argue that Smith's use of force was so plainly excessive that he would have been on notice that he was violating the Fourth Amendment. (*See* Resp. at 1503) ("His conduct was such that any reasonable official would have understood that resorting to deadly for violated Plaintiff's constitutional rights."). Where no analogous precedent exists, a plaintiff can

satisfy the "clearly established law" prong of the qualified immunity inquiry "by showing the violation was so obvious that no reasonable officer could believe his actions were constitutional." *Villalobos*, 168 F.4th at 1063 n.2. However, "it is a 'rare case[ ] in which the constitutional violation is patently obvious and so outrageous' that an officer loses the qualified immunity defense in this way." *Id.* (alteration in original) (quoting *Smith v. Finkley*, 10 F.4th 725, 746 n.8 (7th Cir. 2021)).

Although not entirely clear, Plaintiff's main contention seems to be that Smith's conduct was plainly excessive because Smith "made no attempt to deescalate the situation" before shooting. (Resp. at 1503). Plaintiff argues that "[i]f Smith just *cracked* his door as he claimed, he would have had two to three seconds to close the door as Plaintiff was rising to his feet." (*Id.*) According to Plaintiff, "[a]s a Chicago police officer, [Smith] is held to a higher standard," and "[h]e is also bound by CPD General Orders which specifically delineate that deadly force is a last resort and should only be used after an officer attempts de-escalation." (*Id.*)

Plaintiff cites no legal authority supporting his argument that Smith's force was plainly excessive for purposes of qualified immunity. (*See id.*) Plaintiff contends merely that Smith violated CPD's General Orders, but CPD's policies are inapposite because "[t]he excessive-force inquiry is governed by constitutional principles, not police-department regulations." *United States v. Brown*, 871 F.3d 532, 536-537 (7th Cir. 2017). Plaintiff's argument that Smith's force was plainly excessive therefore lacks development and support. As such, the Court rejects it.

**e. <u>Factual Dispute</u>**

Plaintiff's final argument is that "the existence of a factual dispute about the circumstances surrounding Smith's decision to shoot Plaintiff precludes a ruling on qualified immunity." (Resp. at 1502). In support of this argument, Plaintiff asserts that "*Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) instructs that a 'dispute of fact regarding the circumstances surrounding an officer's use of force may prevent us from determining whether an individual's clearly established

rights have been violated.'" (Resp. at 1502) (purporting to quote *Weinmann*, 787 F.3d at 451). This argument has three issues. First, the quote Plaintiff attributes to *Weinmann* does not actually appear in the case. Thus, counsel is reminded to exercise care when preparing briefs to ensure factual and legal accuracy in accordance with his obligations under Federal Rule of Civil Procedure 11.

Second, it is true that "a dispute of fact regarding the circumstances surrounding an officer's use of force may prevent [courts] from determining whether an individual's clearly established rights have been violated." *Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018).[8] However, even if Plaintiff can establish a genuine dispute of fact as to the constitutional-violation element of the qualified immunity analysis, he must still establish the clearly-established-law element to survive summary judgment, which he has not done. *See Jain v. Bd. of Educ. of Butler Sch. Dist. 53*, 366 F. Supp. 3d 1014, 1020 (N.D. Ill. 2019) ("Assuming for the sake of argument that plaintiff A has established a genuine issue of material fact as to the first prong, the Court turns to the second prong of the qualified-immunity analysis, because a plaintiff's failure to establish *either* prong is dispositive.").

Third, even if the Court construes all genuine factual disputes in Smith's favor, Plaintiff still cannot show that Smith violated clearly established law, as discussed next.

**2. <u>Constitutional Violation</u>**

"[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U.S. at 388. The Supreme Court "has long recognized that the right to make an arrest or investigatory stop

[8] Plaintiff seems to have attributed a quote from *Strand* to *Weinmann*. The full *Strand* quote is "*Weinmann* also instructs that a dispute of fact regarding the circumstances surrounding an officer's use of force may prevent us from determining whether an individual's clearly established rights have been violated." *Strand*, 910 F.3d at 918 (citing *Weinmann*, 787 F.3d at 451).

necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Determining whether the force used was "objectively reasonable" requires balancing the interests of both the individual and the government. *Id.* "Factors relevant to the reasonableness inquiry include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (quoting *Graham*, 490 U.S. at 396)). "The actual officer's subjective beliefs and motivations are irrelevant." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) (*Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003)). Thus, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

Application of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case." *Id.* at 396. The analysis requires consideration of the totality of the circumstances and the information the officer knew at the time the force was applied. *Horton*, 883 F.3d at 949-950. The Court must be vigilant to avoid viewing the facts "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Instead, it must consider the point of view of a reasonable officer on the scene, and the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397.

Courts evaluating the reasonableness of deadly force "focus on the danger posed by the person to whom the force was applied." *Est. of Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020). The use of deadly force is objectively reasonable where a "reasonable officer in

the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others." *Id.* (internal quotation marks omitted) (quoting *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018)). The Fourth Amendment does not "require[] the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable." *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994).

Smith contends that his use of force was objectively reasonable under the circumstances because (1) he "had probable cause to believe Plaintiff's actions placed him and his family in imminent danger of death or serious bodily harm"; or (2) he was defending his dwelling. (Mem. at 819). Plaintiff disagrees, arguing that "there was no need for the use of force" because "Plaintiff posed no threat to Defendant Smith." (Resp. at 1478). According to Plaintiff, "[e]ven if Smith reasonably believed that Plaintiff posed a threat, the amount of force he used was disproportionate to the threat." (*Id.*) Plaintiff argues that Smith should have attempted to de-escalate the situation before resorting to deadly force and that Smith's story about a struggle at the door is not credible. (*Id.* at 1478, 1480).

But Plaintiff is asking this Court to improperly judge Smith's actions "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. At some time after the shooting, it was determined that Plaintiff was not actually a threat to Smith, but nothing in the record suggests that a reasonable officer should have known that at the time of the incident. Even construing all facts and drawing all reasonable inferences in Plaintiff's favor, it is undisputed that Plaintiff was at Smith's door, uninvited, around 1:00 a.m. in Chicago. (Dkt. 176 ¶¶ 21, 26). It is also undisputed that Smith had no way of knowing if only one person was outside his apartment door or multiple people much less what weapons they might possess because he could not see into the hallway without actually opening the door. (*Id.* ¶¶ 34-35, 37). Plus, Smith and Colon both testified that they heard Plaintiff

touching their door handle in some way.[9] (Dkt. 176 ¶ 29). Under these circumstances, it was not unreasonable for Smith or any other police officer to fear that whoever was on the other side of the door had ill intentions.

Plaintiff argues that Smith unreasonably created the situation that led him to use deadly force because a reasonable person would have would have gone to the door, unarmed, and asked, "who is it?", or called the police. (Resp. at 1480) (citing *Doornbos v. City of Chicago*, 868 F.3d 572 (7th Cir. 2017)). This argument is unpersuasive for two main reasons. First, there is a factual dispute as to whether Smith asked "who is it?" before opening the door. Smith testified that he said, "who is it?" through the door more than three times, (Dkt. 176 ¶ 31), although Colon testified that Smith did not say anything other than "stand back," (Resp., Ex. 6 (Colon Jacobo Dep.) at 1787-1788, 1796). Again, because Plaintiff lacks any independent recollection of that night after his arrival at a neighborhood bar around 10:00 p.m. and the surveillance video reflecting his arrival at Smith's building around 12:40 a.m. contains no audio, Plaintiff cannot reliably say what Smith did or did not say inside Smith's apartment by the door during their encounter. In sum, Plaintiff cannot avoid summary judgment simply by claiming that Smith should have made certain statements before opening the door where the facts and the law do not support that proposition.

Second, it is unreasonable to expect Smith to call the police because he is a police officer himself, and both parties agree that Smith was acting as one during his encounter with Plaintiff. (Dkt. 206 ¶ 22; Reply at 3190). Police are expected to investigate suspicious activity, and they

[9] Plaintiff disputes their testimony but fails to point to anything in the record to refute those statements. Indeed, Plaintiff was extremely intoxicated that night and has no independent recollection of any of these events, and he admits that "[t]he video does not show what [he] was doing at the door." (Dkt. 176 ¶ 29). Having reviewed the shooting video multiple times, the Court concurs with his assessment that his actions are unclear. In other words, he may have been brushing up against the door and touching the handle as if trying to enter the apartment exactly as Smith and Colon described. Plaintiff's assertion that his actions were not suspicious to a reasonable police officer is purely speculative and not based on personal knowledge. That is insufficient to create a genuine dispute of fact because Plaintiff "cannot rest on mere unsupported denials," and instead, "must come forward with contradictory evidence of his own." *Hannon v. Turnage*, 892 F.2d 653, 657 (7th Cir. 1990).

"serve the public by voluntarily going into dangerous situations." *Cruz v. City of Chicago*, No. 20 C 250, 2021 WL 2645558, at *6 (N.D. Ill. June 28, 2021); *see also Clark v. Pauer*, No. 25-CV-329, 2026 WL 1091703, at *4 (E.D. Wis. Apr. 22, 2026) ("Police officers are expected to put themselves in danger, yet they retain the privilege to defend against the dangers they face."). Plaintiff argues that CPD General Order G03-02-01 Section III.A.4.c "advises members to call for backup personnel," (Resp. at 1480 n.3), but, again, police department regulations do not govern the excessive-force inquiry, *Brown*, 871 F.3d at 536-537.

Moreover, the Court questions whether General Order G03-02-01 Section III.A.4.c applies here. Section III.A.4.c provides that officers must consider calling for backup "[w]hen encountering noncompliance to lawful verbal direction" and "when it is safe and feasible to do so." (Resp., Ex. 13 (CPD Gen. Orders) at 2561-2562, Dkt. 188-13). Plaintiff seems to be arguing that if Smith gave verbal directions with which he did not comply, Smith was obligated to call for backup. (*See* Resp. at 1479-1480). But that is not what the policy says. Additionally, Smith could have reasonably believed that calling for backup was not safe or feasible given that Plaintiff was already there at his door and not responding to his inquiries. In any event, even if Section III.A.4.c applies, Smith's "compliance with the rules of his department is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirement." *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017). Consequently, Plaintiff has not shown that Smith unreasonably created the encounter between himself and Plaintiff.

"Law enforcement officers are expected to act reasonably, not infallibly." *Mason-Funk v. City of Neenah*, 296 F. Supp. 3d 1006, 1016 (E.D. Wis. 2017), *aff'd,* 895 F.3d 504 (7th Cir. 2018). Probable cause "is 'assessed objectively' based on 'the conclusions that the . . . officer reasonably might have drawn from the information known to him.'" *Young v. City of Chicago*, 987 F.3d 641,

644 (7th Cir. 2021) (quoting *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007)). For an officer to have probable cause, "[t]he officer's belief need not be 'correct or even more likely true than false, so long as it is reasonable.'" *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022) (internal quotation marks omitted) (quoting *Fleming v. Livingston Cnty.*, 674 F.3d 874, 879 (7th Cir. 2012)).

When Smith opened the door and found himself face-to-face with Plaintiff, he had to make "split-second judgment[]" in a "tense" and "uncertain" situation. *Graham*, 490 U.S. at 397. Smith did not know who Plaintiff was, whether Plaintiff was armed, or why Plaintiff was at his door after midnight. And Smith had virtually no additional time to find out because Plaintiff was immediately before him. Although we now know that Smith misread the situation, based on the limited information available to him at the time of the shooting, Smith and any other police officer would have reasonably believed Plaintiff posed an imminent threat to him and his family. As such, the Court cannot find that Smith violated clearly established law and, instead, holds that Smith's use of deadly force was objectively reasonable under the Fourth Amendment.[10] *See Est. of Biegert*, 968 F.3d at 699.

In sum, Smith is entitled to qualified immunity from Count 1.

**B. <u>Count 4: Malicious Prosecution</u>**

Count 4 is a Fourth Amendment malicious prosecution claim against the Individual Defendants.[11] (FAC ¶ 61). A plaintiff bringing a Fourth Amendment malicious prosecution claim

---

[10] Having concluded that Smith had probable cause to believe Plaintiff's actions placed him and his family in imminent danger of death or serious bodily harm, the Court need not reach Smith's alternative argument that he acted in defense of his dwelling.

[11] Similar to his excessive force claim, Plaintiff alleges in his amended complaint that Defendants subjected him to a malicious prosecution in violation of his Fourth *and* Fourteenth Amendment rights, but Plaintiff does not mention the Fourteenth Amendment claim in his response brief. (FAC ¶ 61). As a result, this claim is deemed abandoned. *See Palmer*, 327 F.3d at 597-598. Regardless, "a § 1983 claim for unlawful pretrial detention rests *exclusively* on the Fourth Amendment." *Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019).

must prove "that criminal proceedings (1) were instituted without probable cause and (2) for a malicious motive; (3) ended without a conviction; and (4) resulted in the plaintiff's seizure by government officials." *Jackson v. City of Chicago*, No. 22 C 4337, 2024 WL 5264703, at *3 (N.D. Ill. Dec. 31, 2024) (citing *Evans v. Matson*, No. 23-2954, 2024 WL 2206638, at *2 (7th Cir. May 16, 2024)). As explained below, the Individual Defendants are entitled to qualified immunity on Count 4 because Plaintiff cannot establish a constitutional violation.

The Individual Defendants argue that Plaintiff's malicious prosecution claim fails because probable cause existed for Plaintiff's charges, noting that a Cook County judge found probable cause to detain Plaintiff at a bond hearing on April 2, 2021, and later that month, a grand jury indicted Plaintiff on the home invasion, criminal trespass to residence, and residential burglary charges. (Mem. at 846).

A judicial determination of probable cause is presumed valid. *Lewis*, 914 F.3d at 477. However, a plaintiff can rebut this presumption by "showing that the officer who sought the [determination] 'knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officer's determination that probable cause existed.'" *Johnson v. Myers*, 53 F.4th 1063, 1069 (7th Cir. 2022) (quoting *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010)).

"Similarly, a grand jury 'indictment is prima facie evidence of probable cause.'" *Lee v. Harris*, 127 F.4th 666, 672 (7th Cir. 2025) (quoting *Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019)). To rebut this presumption, a plaintiff must show "that law enforcement obtained the indictment through improper or fraudulent means." *Coleman*, 925 F.3d at 351. In other words, a plaintiff "must demonstrate defendants knew they lacked probable cause to arrest him." *Id.*

Plaintiff argues that he can rebut the validity of the judicial probable-cause determination at his bond hearing and the grand jury indictment because his "arrest was based solely on Smith's false claims that Plaintiff had forced his way into his apartment after 'overpowering him' at his door," and because the detective who testified before the grand jury "repeat[ed] Smith's false version [of events], even though by then he knew it was contradicted by the security video, alleging that Plaintiff pushed his way into Smith's apartment, while Smith attempted to push him back." (Resp. at 1487). Plaintiff further contends that "[t]he detective told the grand jury that Smith warned him to get back, but he was losing his grip on the door as Plaintiff pushed further into the apartment." (*Id.*)

The Court disagrees. First, the transcript of Plaintiff's April 2, 2021 bond hearing is not in the record, so Plaintiff's assertion that his "arrest was based solely on Smith's false claims" is unsupported by evidence and thereby fails to rebut the validity of the probable-cause determination at his bond hearing. Second, Plaintiff contends that the detective "knew" that Smith's version of events "was . . . contradicted by the security video," but the video does not necessarily contradict Smith's story. Because of the wall blocking the view of the door to Smith's apartment, the video is inconclusive. Once Smith opens the door, Plaintiff steps further into Smith's doorway and out of view of the surveillance camera. (Video at 1:23:22-1:23:25). Plaintiff does not become visible again until after he is shot seconds later. (*Id.*)

The video does not foreclose the possibility that Plaintiff and Smith engaged in a very brief struggle at the door before Plaintiff was shot, so it is not apparent that Smith's story is false or that the detective knowingly told the grand jury a false story. Moreover, Smith's story was all the prosecution had at that time given that Plaintiff has no memory of the night himself, Smith's wife told detectives that she did not see what happened at the door, and the video did not clearly capture

what transpired. (Dkt. 176 ¶ 23; Case Sup. Report at 1136-1137). Thus, Plaintiff has not shown that the grand jury indictment was obtained through improper or fraudulent means either.

Because the existence of probable cause is a complete defense to a Fourth Amendment malicious prosecution claim, Plaintiff cannot show that he suffered a constitutional violation. *See Washington v. City of Chicago*, 98 F.4th 860, 863 (7th Cir. 2024) ("The existence of probable cause is a defense to both Fourth Amendment and [Illinois] malicious prosecution claims."). But even if the probable-cause determinations in Plaintiff's criminal case were tainted, Plaintiff cannot show that the Individual Defendants caused that because his case was independently investigated by CPD's Investigative Response Team and reviewed by the CCSAO before the CCSAO filed the criminal complaint. *Cf. id.*, 98 F.4th at 873 (concluding that prosecutors' independent investigation before filing charges barred a finding of but-for causation).

In sum, the Individual Defendants are entitled to qualified immunity from Count 4 because Plaintiff has not shown a constitutional violation. *See Leiser*, 933 F.3d at 701. The City of Chicago is entitled to summary judgment on Count 4 as well because a *Monell* claim cannot stand without an underlying constitutional violation. *See Fulton v. Bartik*, 547 F. Supp. 3d 799, 819 (N.D. Ill. 2021) ("*Monell* liability cannot survive without an underlying constitutional violation by an individual defendant.").

## II. <u>State-Law Claims</u>

Because Defendants are entitled to summary judgment on Plaintiff's constitutional claims, only Plaintiff's state-law claims remain. Although the general rule is that federal district courts should relinquish jurisdiction over supplemental claims when all federal claims in a suit are dismissed before trial, *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997); *see* 28 U.S.C. § 1367(c)(3), the Court will retain jurisdiction over Plaintiff's state-law claims because "it

is absolutely clear" how they should be decided, *see RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Sharp Elecs. Corp. v. Metro. Life Ins. Co.,* 578 F.3d 505, 514-515 (7th Cir. 2009)).

**A. <u>Count 3: Battery</u>**

Count 3 is a state-law battery claim against Officer Smith. (FAC ¶¶ 54-58). The FAC alleges that Smith shot Plaintiff in the face "without sufficient justification or provocation" and that Smith's actions "constituted an offensive physical contact, undertaken willfully and wantonly, proximately causing Plaintiff to suffer injuries and damages." (*Id.* ¶¶ 55-56).

In Illinois, "[a] battery generally is defined as an unauthorized touching of another's person." *Welton v. Ambrose*, 351 Ill. App. 3d 627, 636 (4d Dist. 2004) (citing *Curtis v. Jaskey*, 326 Ill. App. 3d 90, 93 (2d Dist. 2001)). Smith argues he is not liable for the shooting because he was acting in self-defense and is immunized from liability under Illinois's Tort Immunity Act. (Mem. at 838). The Tort Immunity Act provides that "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The Act defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

Because Plaintiff's excessive force claim fails, his battery claim fails as well. Smith's "use of force cannot be considered willful and wanton for the same reasons it was reasonable under the Fourth Amendment." *Mendez v. City of Chicago*, 160 F.4th 888, 892 (7th Cir. 2025) (citing *Ybarra v. City of Chicago*, 946 F.3d 975, 981 & n.1 (7th Cir. 2020)); *see Horton*, 883 F.3d at 954 ("The district court correctly concluded that since Pobjecky's actions were objectively reasonable, they

cannot be willful and wanton, so Defendants were entitled to immunity, and the state-law claims failed."). Accordingly, Smith is entitled to summary judgment on Count 3.

**B. Count 4: Malicious Prosecution**

Defendants are entitled to summary judgment on Plaintiff's state-law malicious prosecution claim because the existence of probable cause is a complete defense to both federal and Illinois malicious prosecution claims. *Washington*, 98 F.4th at 863.

**C. Count 2: Indemnification**

Plaintiff's remaining claim, Count 2, is an indemnification claim pursuant to 735 ILCS 10/9-102 against the City of Chicago. (FAC ¶¶ 50-53). An indemnification claim cannot survive without an underlying substantive claim for liability, so the City is entitled to summary judgment on Count 2. *See Baskins v. Gilmore*, No. 17 C 7566, 2018 WL 4699847, at *12 (N.D. Ill. Sept. 30, 2018) ("An indemnification claim necessarily will be tied to an underlying claim for liability.").

**CONCLUSION**

For all the foregoing reasons, Defendants' motion for summary judgment is granted.

**DATED**: September 25, 2026

**ENTERED**:

LaShonda A Hunt

LASHONDA A. HUNT
United States District Judge